UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **DAVID WOODALL,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | Case No.: 4:22-cv-01357-RDP |
| } | |
| **CARGILL MEAT SOLUTIONS** } | |
| **CORPORATION,** } | |
| } | |
| **Defendant.** } | |

### MEMORANDUM OPINION

This matter is before the court on Defendant Cargill Meat Solutions Corporation's ("Cargill") Motion for Summary Judgment (Doc. # 61), Motion to Exclude Causation Opinions of Chuck Scarrott (Doc. # 68), and Motion to Strike Chuck Scarrott's Supplemental Expert Report. (Doc. # 72). The Motions have been fully briefed. (Docs. # 61, 62, 63, 64, 65, 66, 67, 69, 70, 73; 68, 71, 74; 72, 75, 76). After careful review, and for the reasons outlined below, Cargill's Motion for Summary Judgment (Doc. # 61) is due to be granted, and its Motion to Exclude Causation Opinions of Chuck Scarrott (Doc. # 68) and Motion to Strike Chuck Scarrott's Supplemental Expert Report (Doc. # 72) are due to be denied as moot.

**I.    Background**

This case involves allegations of negligence and wantonness. Plaintiff was injured while using tugger machinery (referred to as a "tugger") at a facility owned by Cargill. (Doc. # 15). Plaintiff alleges that Cargill breached its duty to exercise ordinary care to keep its premises and its contents in a reasonably safe condition and failed to sufficiently warn Plaintiff of dangerous

conditions on its premises. (*Id.* ¶ 13). Plaintiff also alleges that Cargill negligently installed and maintained the devices used to secure the tugger where Plaintiff was working. (*Id.*).

The facts set out in this section are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the facts that could be established through live testimony at a trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

On April 5, 2021, Plaintiff was injured while repairing a conveyor at Cargill's facility in Guntersville, Alabama. (Doc. # 15 ¶¶ 10-11). At the time of the incident, Plaintiff worked for Byrd Maintenance Services, Inc. ("BMSI"), which was Cargill's independent contractor. (Docs. # 62-1 at 2, 3; 62-2 at 14; 62-8 at 5).

Under its contract with Cargill, BMSI was generally discouraged from using Cargill's equipment (Doc. # 62-1 at 6), but if BMSI did use Cargill's equipment, it agreed to inspect that equipment before its use. (*Id.*; Doc. # 62-6 at 16). BMSI also agreed to "release, indemnify, and hold harmless [Cargill] Indemnities from and against any and all claims, damages, demands, liabilities, losses, fines, penalties, costs and expenses (including attorney fees) of whatsoever kind or character arising out of or in any way connected with the use of any [Cargill] Equipment." (Doc. # 62-1 at 6). Additionally, under the contract with Cargill, BMSI was responsible for ensuring that its employees performed their work safely. (*Id.* at 5). BMSI agreed to "explicitly warn and notify its employees . . . of any risks, hazards, or peculiar dangers associated with the Work site . . . of which [BMSI] is or should be reasonably aware." (*Id.*). And, as part of its obligation to warn its employees of any risks or dangers of which it was aware, BMSI had to fill out Pre-Job Hazard

Assessment ("PJHA") forms for jobs they were to complete at Cargill's facility. (Docs. # 62-2 at 24-25; 62-5 at 2-3 [the PJHA form]). For any given job, the PJHA forms outlined "the steps of the job, the hazards . . . , the control measures that [would be] taken, what could the worst-case scenario be, and what are you going to do if [the worst-case scenario] happens." (Doc. # 62-2 at 25; *see also* Doc. # 62-5 at 2-3).

Before the incident at issue in this case, Plaintiff had worked for BMSI "on and off" since 1997. (Doc. # 62-8 at 5). During the time that Plaintiff worked for BMSI, he had worked at Cargill's facility on fifty or more occasions. (*Id.* at 7). In the five years leading up to the incident, Plaintiff was a supervisor for BMSI. (*Id.* at 5). In that role, it was his responsibility not only "[t]o get everything for the jobs," but also to act as foreman for his crew and ensure that his crew followed safety instructions from daily safety meetings. (*Id.* at 5, 6).

On the day of the incident, Plaintiff and his crew were at Cargill's facility to replace a drag chain inside of a conveyor; this job required the use of a tugger. (*Id.* at 12-13; 63-1 at 4). The tugger would operate as a cable puller, and was used to pull the new drag chain into place. (Doc. # 63-1 at 4). Again, BMSI was generally discouraged from using Cargill's equipment (Doc. # 62-1 at 6); however, in practice, BMSI regularly used Cargill's tugger. (Docs. # 62-3 at 36; 62-2 at 14). In fact, Cargill personnel did not use the tugger – only BMSI did. (Doc. # 62-2 at 12). Thus, whenever drag chains needed to be replaced, it was BMSI who performed that task. (*Id.* at 13, 14; Doc. # 62-7 ¶ 9).

BMSI, not Cargill, generally trained Plaintiff on how to do his job. (Doc. # 62-7 ¶ 12). But, BMSI did not train Plaintiff on how to use a tugger. (Doc. # 62-8 at 6). Instead, Plaintiff testified that he trained himself on how to use the tugger by "just hook[ing] it up." (*Id.*). Plaintiff admitted that he did not read or try to read an instruction manual for use of the tugger. (*Id.* at 6-7). The

3

tugger manual warns that defects or issues with parts could result in injury or death. (Doc. # 63-2 at 4-6).

Plaintiff estimated that before his injury, he had used a tugger "probably a hundred" times. (Doc. # 62-8 at 6). He testified that he used tuggers "more at Cargill than anywhere" else because "[a]bout everything you do at Cargill you have to have tuggers." (*Id.* at 7). Therefore, although Plaintiff had never read or tried to read an instruction manual for a tugger, he knew how to set one up and use it. (*Id.* at 6-7). When he borrowed Cargill's tugger, Plaintiff testified that he would inspect it before using it. (*Id.* at 10-11).

On the day of the incident, Plaintiff was chosen to be the foreman of his crew because of his knowledge and experience, including his previous use of the tugger. (Docs. # 62-7 ¶ 14). Plaintiff had performed similar jobs to the one assigned to him and his crew on the day of the incident (Doc. # 62-8 at 12), and he testified that he had replaced drag chains using a tugger "probably fifty or more" times while at Cargill. (*Id.* at 7).

Plaintiff's crew consisted of Kane Hogan ("Hogan"), Trevor Flowers ("Flowers"), and Eugene Wilson ("Wilson"). Scott Langlois ("Langlois") was the crew's supervisor for the project. (Docs. # 62-7 ¶ 6; 62-8 at 11). Langlois had worked for BMSI as an on-site contractor and Site Superintendent at Cargill's facility for roughly seventeen years before the incident. (Doc. # 62-7 ¶ 4). In that role, Langlois completed numerous projects for Cargill, became very familiar with its facility and operations, and supervised BMSI crews who performed work at Cargill's facility. (*Id.* ¶¶ 2, 5, 7, 9-11).

Before performing the task with the tugger, BMSI completed and Plaintiff signed a PJHA form related to the drag chain replacement project, and checked "line of fire" as an "error trap," and "injury/death" as the worst-case scenario. (Docs. # 62-2 at 24-25, 27; 62-5 at 2-3; 62-7 ¶ 18;

4

62-8 at 35-36). The "line of fire" is the "anticipated direction of path in which an object would travel if energy was released." (Doc. # 62-6 at 29; *see also* Doc. # 62-2 at 25). In other words, it is "the line of force between the pulling device and the thing being pulled." (Doc. # 65-3 at 13). On the day of the incident, before Plaintiff and his crew began the job, there was a pre-job safety meeting between BMSI and Cargill. (Doc. # 62-8 at 34). The meeting did not discuss the line of fire risk. (*Id.*). Plaintiff also attended a walkthrough with Langlois before performing the job with his crew. (Docs. # 62-7 ¶ 15; 62-8 at 12). Plaintiff testified that he did not remember having any particular safety discussions with Langlois during the walkthrough. (Doc. # 62-8 at 12).

Before beginning the job with the tugger, Hogan, Flowers, and Wilson used a forklift to move the tugger from Cargill's maintenance shop to the site. (*Id.* at 11). Cargill did not inspect the tugger before allowing BMSI to use it. (Doc. # 62-2 at 10). Only Plaintiff and his crew set up the tugger; no one from Cargill helped them set up the tugger. (*Id.* at 13, 29).

The tugger was anchored to a bracket via "vise chains," and the bracket was anchored to the floor via concrete bolts. (Doc. # 63-1 at 4). Plaintiff helped his crew set the tugger up on the bracket, holding the tugger level while his crew members tightened the vise chains securing the tugger to the bracket. (Doc. # 62-8 at 13). Plaintiff's crew bolted the bracket into the floor, but did not bolt it down completely. (Doc. # 65-4 ¶ 7). Plaintiff personally inspected how the bracket was incompletely secured to the floor and decided to move forward with the project regardless. (*Id.* ¶ 8). Before using the tugger, Plaintiff and his crew inspected it to "see if everything was tight" and did not notice anything amiss, finding that the tugger looked to be in good shape. (Doc. # 62-8 at 28-29).

The tugger was a Series 6000 Super Tugger that includes a part called an entrapment peg. (Doc. # 63-2 at 7). The function of this peg is to guide the rope that pulls the drag chain and help

prevent overlapping. (*Id.* at 17). Overlapping of the rope increases the force exerted on the tugger. (Doc. # 63-1 at 52). The specific tugger used on the project did not have an entrapment peg. (*Id.* at 18; Doc. # 66-2 at 3). Instead, the entrapment peg was replaced by a bolt. (Docs. # 63-1 at 18; 62-6 at 26). Cargill does not know when or how the original peg broke. (Doc. # 62-2 at 18). Cargill also does not know who modified that part of the tugger (Doc. # 62-6 at 26); however, the tugger was kept exclusively in the maintenance shop at Cargill's Guntersville facility when it was not in use. (*Id.* at 32-33).

Once the tugger was set up, Plaintiff and his crew removed the old drag chain and then they began loading the new drag chain into the conveyor. (Doc. # 62-8 at 14-15). That is when the incident occurred. (*Id.*). At the time of the incident, Hogan was standing outside of the room where the crew was using the tugger ensuring from his vantage point that there were no issues with the pull rope that was attached to the tugger and pulling the drag chain. (*Id.* at 15-16). Wilson and Flowers were "running the tugger" – Flowers was holding the pull rope to ensure that the proper amount of tension was maintained on the rope and Wilson was operating the tugger's on/off switch and monitoring the force gauge. (*Id.* at 16; Doc. # 65-5 ¶ 10).

At some point while Plaintiff and his crew were loading the new drag chain into the conveyor, the resistance increased on the drag chain, the vise chains securing the tugger failed, and the tugger became a projectile, flying approximately twenty-five feet across the room and striking Plaintiff in the leg. (Docs. # 62-8 at 20, 27; 63-1 at 4). The parties and experts agree that Plaintiff was standing directly in the line of fire when he was injured. (Docs. # 62-8 at 31; 65-3 at 7; 63-1 at 58; 62-4 at 7).

When asked whether he was aware on the date of the incident whether there could be danger due to standing in the line of fire while using the tugger, Plaintiff testified, "No, I wasn't

expecting anything. I mean, we used it so many times nothing has ever been – so we [weren't] expecting nothing like this." (Doc. # 62-8 at 36). Plaintiff's supervisor Langlois understood the dangers of using the tugger in an unsafe manner, including standing in the line of fire, and knew how to safely use a tugger to replace a drag chain without placing himself in the line of fire. (Doc. # 62-7 ¶¶ 10-11). On a previous occasion, Langlois used the same tugger to complete the same project Plaintiff was working on when he was injured. (*Id.* ¶ 9). Langlois completed that project without injury or issue and never placed himself in the line of fire. (*Id.* ¶¶ 9, 11).

## II.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is

7

merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is

clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III. Discussion

Plaintiff's Amended Complaint asserts one count against Cargill for negligence/wantonness. (Doc. # 15). Plaintiff alleges that on April 5, 2021, the day of the incident, Cargill owed Plaintiff "a duty to exercise ordinary or reasonable care to keep the premises and its contents in a reasonably safe condition and/or to sufficiently warn Plaintiff Woodall of dangerous conditions upon the premises. Additionally, [Cargill] negligently installed and/or maintained the devices used to secure the tugger where the Plaintiff was working." (*Id.* ¶ 13). Plaintiff's wantonness claim is stated in the same count, premised on the same conduct. (*See id.* ¶¶ 12-17).

Cargill argues that Plaintiff's negligence claim fails as a matter of law because he cannot establish duty, breach, or causation. (Doc. # 67). Cargill also argues that it is entitled to summary judgment based on three of its affirmative defenses: (1) contributory negligence, (2) assumption of the risk, and (3) the open and obvious doctrine. (*Id.*). Finally, Cargill argues that there is no evidence to support a wantonness claim. The court addresses Plaintiff's negligence claim first, then considers his wantonness claim.

### A. Plaintiff's Negligence Claim

To establish a negligence claim under Alabama law, a plaintiff must show: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (internal quotation marks omitted). "The duty owed by a landowner to an injured party depends upon the status of the injured party in relation to the landowner's land, i.e., is the injured party a trespasser, a licensee, or an invitee." *Galaxy Cable, Inc. v. Davis*, 58 So. 3d 93, 98 (Ala. 2010) (footnote omitted). "A person who enters land with the

landowner's consent to bestow some material or commercial benefit is an 'invitee' . . . .'" *Id.* Neither party disputes that Plaintiff was an invitee on Cargill's premises at the time of the incident. (*See* Docs. # 15 ¶ 13; 67 at 19).

"[A] landowner owes an invitee the duty to keep the premises in a reasonably safe condition and, if the premises are unsafe, to warn of hidden defects and dangers that are known to the landowner but that are hidden or unknown to the invitee." *Galaxy Cable, Inc.*, 58 So. 3d at 98. However, "[i]n discussing a premises owner's liability towards an independent contractor, [the Alabama Supreme Court] has recognized that 'an owner of premises is not responsible to an independent contractor for injury from defects or dangers which the contractor knows of, or ought to know of.'" *Roberts v. NASCO Equip. Co.*, 986 So. 2d 379, 383 (Ala. 2007) (cleaned up) (quoting *Ex parte Meadowcraft Indus., Inc.*, 817 So. 2d 702, 706 (Ala. 2001) (in turn quoting *Glenn v. United States Steel Corp.*, 423 So. 2d 152, 154 (Ala. 1982))). "Moreover, '[t]here is no duty to warn' an independent contractor 'who has equal or superior knowledge of a potential danger.'" *Id.* at 383-84 (cleaned up) (citing *Fielder v. USX Corp.*, 726 So. 647, 650 (Ala. 1998) (quoting *Ala. Power Co. v. Williams*, 570 So. 2d 589, 592 (Ala. 1990))). "Rather, a premises owner's duty to warn arises when the owner is aware 'of dangers that are hidden on or inhere in that property.'" *Id.* at 384 (cleaned up) (citing *Farr Metal, Inc. v. Hines*, 738 So. 2d 863, 864 (Ala. 1999) (quoting *McGregory v. Lloyd Wood Constr. Co.*, 736 So. 2d 571, 575 (Ala. 1999))). "A party claiming that a duty to warn existed must show: '(1) that the defect or danger was "hidden"; (2) that it was "known to the owner"; and (3) that it was "neither known to the contractor, nor such as he ought to know."'" *Id.* (citing *Meadowcraft*, 817 So. 2d at 706 (in turn quoting *Glenn*, 423 So. 2d at 154)).

As the Alabama Supreme Court has explained:

> the existence of a duty by a premises owner to a business invitee, and particularly to an independent contractor, depends on superiority of knowledge. . . . [T]he

> standard by which we judge the premises owner is whether the premises owner acted in an objectively reasonable manner. The premises owner is not an insurer of his premises and, by the same token, is not an insurer of the acts or omissions of the contractors it brings onto its premises. The existence of a duty on the part of the premises owner to an employee of such a contractor depends, then, on what information the premises owner reasonably could have expected that contractor to have known and acted upon.

*S. Ala. Brick Co., Inc. v. Carwie*, 214 So. 3d 1169, 1178 (Ala. 2016) (reversing judgment against a premises owner, finding no duty to warn contractor's employees based on their previous experience on the premises).

Therefore, if the premises owner "'can reasonably expect that its contractor knows as much or more than the [premises owner] does regarding a dangerous condition,' the [premises owner] has no duty to warn." *Gray v. L.B. Foster Co. Inc.*, 761 F. App'x 871, 873 (11th Cir. 2019) (quoting *S. Ala. Brick Co.*, 214 So. 3d at 1178). A premises owner "can reasonably expect that its contractor knowns as much or more than the [premises owner] when: (1) 'the danger is open and obvious to anyone,' (2) 'the [premises owner] has told the contractor all it knows, or (3) the contractor has sufficient 'expertise and previous experience on the premises.'" *Id.* (quoting *S. Ala. Brick Co.*, 214 So. 3d at 1178).

As the court explains below, the Rule 56 record shows it is undisputed that Cargill reasonably could have expected that BMSI and Plaintiff knew as much (if not more) than Cargill about the dangers of using the tugger. This was based on both BMSI's and Plaintiff's expertise and previous experience. Therefore, Cargill did not have a duty to warn Plaintiff.

First, although BMSI was generally discouraged from using Cargill's equipment (Doc. # 62-1 at 6), in practice, BMSI regularly used Cargill's tugger. (Docs. # 62-3 at 36; 62-2 at 14). In fact, Cargill did not even use the tugger itself – only BMSI did. (Doc. # 62-2 at 12). Thus, whenever drag chains needed to be replaced (as they did on the date of the incident), it was BMSI who

performed the task with the tugger. (*Id.* at 13, 14; Doc. # 62-7 ¶ 9). BMSI also agreed to inspect Cargill's equipment before using it. (Docs. # 62-1 at 6; 62-6 at 16).

Additionally, under its contract with Cargill, BMSI agreed to "explicitly warn and notify its employees . . . of any risks, hazards, or peculiar dangers associated with the Work site . . . of which [BMSI] is or should be reasonably aware." (Doc. # 62-1 at 5). And, as part of its obligation to warn its employees of any risks or dangers that it was aware of, BMSI was obligated to fill out PJHA forms for jobs they were to complete at Cargill's facility. (Docs. # 62-2 at 24-25; 62-5 at 2-3). For any given job, the PJHA forms outlined "the steps of the job, the hazards . . . , the control measures that [would be] taken, what could the worst-case scenario be, and what you are going to do if [the worst-case scenario] happens." (Doc. # 62-2 at 24; 62-5 at 2-3).

Before Plaintiff and his crew began the job at issue here, there was a pre-job safety meeting between BMSI and Cargill. (Doc. # 62-8 at 34). Although the meeting did not discuss the line of fire risk (*id.*), BMSI completed and Plaintiff signed a PJHA form for the drag chain replacement project, wherein "line of fire" was checked as an "error trap," and "injury/death" was checked as the worst-case scenario. (Docs. # 62-2 at 24-25, 27; 62-5 at 2-3; 62-7 ¶ 18; 62-8 at 35-36).

Based on BMSI's experience with Cargill's equipment and, more specifically, its tugger, Cargill could have reasonably expected that BMSI knew as much or more than Cargill about the dangers of using the tugger. Indeed, BMSI likely knew more than Cargill because the undisputed evidence shows that Cargill did not even use the tugger. And, particularly related to the line of fire risk, although it was not discussed at the safety meeting held before Plaintiff and his crew began the tugger job, BMSI completed and Plaintiff signed a PJHA form which indicated the line of fire as a risk Plaintiff could face when completing the project. Thus, it was objectively reasonable for Cargill to expect that BMSI knew as much or more than Cargill about the line of fire risk.

Plaintiff testified that during the time he worked for BMSI he worked at Cargill's facility on fifty or more occasions (Doc. # 62-8 at 7) and that prior to the incident, he had used a tugger "probably a hundred" times. (*Id.* at 6). He further testified that he used tuggers "more at Cargill than anywhere" else because "[a]bout everything you do at Cargill you have to have tuggers." (*Id.* at 7). Although Plaintiff admitted that he did not read or try to read any instruction manuals (*id.* at 6-7; Doc. # 63-2 at 4-6), he testified that he knew how to set a tugger up and how to use it. (Doc. # 62-8 at 6-7). He also testified that when borrowing Cargill's tugger, he would inspect it before using it. (*Id.* at 10-11). This undisputed record evidence shows Plaintiff's familiarity with using the tugger. The date of the incident was clearly not the first time Plaintiff had used the tugger at Cargill's facility, and he had more familiarity with the tugger than Cargill because he used it regularly – Cargill never did.

Moreover, on the day of the incident, Plaintiff was chosen to be the foreman of his crew *because of his knowledge and experience*, including his previous use of the tugger. (Doc. # 62-7 ¶ 14). Plaintiff had previously performed similar jobs. (Doc. # 62-8 at 12). Indeed, he admitted that he had replaced drag chains using a tugger "probably fifty or more" times at Cargill. (*Id.* at 7).

Based on the Rule 56 record, not only did BMSI have sufficient expertise and previous experience on Cargill's premises, but Plaintiff himself had sufficient expertise and previous experience on Cargill's premises using its tugger.

Despite his experience at Cargill's facility with the tugger, Plaintiff points to his own testimony that he did not know standing in the line of fire was dangerous. But, "the Alabama Supreme Court has explicitly rejected the argument that a [premise owner's] duty to warn turns on the subjective knowledge of an injured party." *Gray*, 761 F. App'x at 875 (citing to *S. Ala. Brick Co.*, 214 So. 3d at 1177). Instead, the inquiry is from the viewpoint of the reasonable premises

13

owner, not based on a subjective, self-serving claim of ignorance of the injured person. So, Cargill's duty to Plaintiff depends on what Cargill reasonably could have expected its contractor to have known. *S. Ala. Brick Co.*, 214 So. 3d at 1178. For the reasons already explained, Cargill could have reasonably expected both BMSI and Plaintiff to know about the line of fire risk based on their previous experience and expertise with the tugger and the PJHA form.

In addition, Langlois, who was Plaintiff's supervisor at BMSI and had worked as an on-site contractor and Site Superintendent at Cargill's facility for roughly seventeen years before the incident, had completed numerous projects for Cargill. (Doc. # 62-7 ¶¶ 2, 4, 5). Over the years, he had become very familiar with Cargill's facility and operations, and supervised BMSI crews who performed work at Cargill's facility. (*Id.* ¶¶ 5, 7, 9). Langlois understood the dangers of using the tugger in an unsafe manner – including standing in the line of fire – and knew how to safely use a tugger to replace a drag chain without placing himself in the line of fire. (*Id.* ¶¶ 9-11). Langlois had also previously used the same tugger to complete the exact same project Plaintiff was working on when he was injured. (*Id.* ¶ 9). He completed that project without injury or issue and without placing himself in the line of fire. (*Id.* ¶¶ 9, 11). Although Plaintiff disputes that he knew about the dangers of standing in the line of fire when using the tugger, Langlois was aware of the dangers, and this knowledge can be imputed to Plaintiff. *See Ex parte Meadowcraft Indus., Inc.*, 817 So. 2d at 708 (citing *Crawford Johnson & Co. v. Duffner*, 279 Ala. 678, 682-83 (1966) (holding that the trial court correctly instructed the jury that a premises owner owes no duty to warn an independent contractor's employees of a danger once the independent contractor is aware of that danger)); *S. Ala. Brick Co.*, 214 So. 3d at 1179 ("The constructive knowledge imputed to individuals working on the project, by virtue of the knowledge of a general contractor, is sufficient to discharge the premises owner of any duty to warn each individual worker of the condition of the premises.").

14

Based on the Rule 56 record, it is undisputed that BMSI and Plaintiff had "sufficient 'expertise and previous experience on the premises.'" *Gray*, 761 F. App'x at 873 (11th Cir. 2019) (quoting *S. Ala. Brick Co.*, 214 So. 3d at 1178). Moreover, and again, "[t]he question is what was objectively reasonable for the [premises owner] to expect the invitee to know." *S. Ala. Brick Co.*, 214 So. 3d at 1177. Here, it was objectively reasonable for Cargill to expect that Plaintiff knew of the dangers of using the tugger, particularly the risk of standing in the line of fire, based on BMSI's, Plaintiff's, and Langlois's expertise and previous experience on the premises the prior work with the tugger, and the PJHA form.

### B. Plaintiff Cannot Use His Summary Judgment Response to Amend His Complaint to Add a Bailment Claim, and, in any event, that Claim is Meritless

Plaintiff presents an additional argument in his response to Cargill's Motion for Summary Judgment. He contends that premises liability cases "are not applicable here since the defect is found within personal, not real property." (Doc. # 70 at 16). Instead, Plaintiff asserts that the law of bailment applies in the instant case and that Cargill as bailor of the tugger owed certain duties to Plaintiff as bailee. But Plaintiff's arguments are inconsistent with what he pleaded in his Amended Complaint. In his negligence/wantonness claim, Plaintiff pleaded the following:

> Plaintiff avers that on or about April 5, 2021, Defendant owed Plaintiff Woodall (a *business invitee* upon Defendant's *premises*) a duty to exercise ordinary or reasonable care to keep the *premises* and its contents in a reasonably safe condition and/or to sufficiently warn Plaintiff Woodall of dangerous conditions upon the *premises*. Additionally, the Defendant negligently installed and/or maintained the devices used to secure the tugger where the Plaintiff was working.

(Doc. # 15 ¶ 13) (emphasis added). Plaintiff's Amended Complaint also alleges that Cargill breached its duties to Plaintiff in the following ways:

> a. failing to use reasonable care and diligence to keep the *premises* in a safe condition;
> b. failing to use reasonable care and diligence to warn visitors of unsafe conditions;
> c. creating a dangerous condition upon the *premises*;

>d. failing to use reasonable care and diligence to remove and/or remedy a dangerous condition and/or machine on the *premises*;
>e. failing to use reasonable care and diligence to operate its *premises* and/or machinery in a way consistent with its own rules, regulations and practices (or other voluntarily-assumed duties); and
>f. failing to use reasonable care and diligent to operate its premises and/or machinery in a way consistent with safe industry practices and/or other standards of care applicable to *premises* like the Defendant's plant in Guntersville, Alabama.

(*Id.* ¶ 14) (emphasis added).

Plaintiff's Amended Complaint does not include a bailment claim. Rather, Plaintiff expressly invokes premises liability as is evidenced by his references to Cargill's premises and his business invitee status. (*Id.* ¶¶ 13-14). As the Eleventh Circuit has made clear, "a plaintiff cannot amend h[is] complaint through argument made in [his] brief in opposition to the defendant's motion for summary judgment." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 859 (11th Cir. 2020) (quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013)). While a non-moving party may assert additional facts in support of an existing claim, he cannot invent a wholly new claim in a summary judgment response. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Thus, the court disregards Plaintiff's bailment theory.

But, even if Plaintiff had properly pleaded a bailment claim in his Amended Complaint (which, to be clear, he did not), there was no bailment between Cargill and BMSI. Alabama law generally defines a bailment as the "delivery of personal property by one person to another for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it." *Ziva Jewelry, Inc. v. Car Wash Headquarters, Inc.*, 897 So. 2d 1011, 1014 (Ala. 2004). "In order for a bailment to exist the bailee must have voluntarily assumed the custody and possession of the property for another." *Id.* As Cargill correctly notes, "[t]he relationship

16

between Cargill and BMSI was much broader than the use of a single tool." (Doc. # 73 at 7). BMSI was an independent contractor for Cargill; Cargill did not deliver its tugger to BMSI or Plaintiff as a bailment.

Further, even if bailment law applied, Cargill still owed no duty to Plaintiff. Pursuant to the contract between BMSI and Cargill, BMSI agreed to "release, indemnify, and hold harmless [Cargill] Indemnities from and against any and all claims, damages, demands, liabilities, losses, fines, penalties, costs and expenses (including attorney fees) or whatsoever kind or character arising out of or in any way connected with the use of any [Cargill] equipment." (Doc. # 62-1 at 6). This release is valid and enforceable. All releases and discharges in writing "must have effect according to their terms and the intentions of the parties thereto." Ala. Code § 12-21-109 (1975). "In the absence of fraud, a release supported by valuable consideration, unambiguous in meaning, will be given effect according to the intention of the parties to be judged from what appears within the four corners of the instrument itself . . . ." *Smith v. State Farm Mut. Ins. Co.*, 494 So. 2d 7, 8 (Ala. 1986).

The release in the contract is clear and unambiguous, and such a clear and unambiguous release is due to be enforced. *Shoreline Towers Condo. Owners Ass'n, Inc. v. Zurich Am. Ins. Co.*, 196 F. Supp. 2d 1210, 1215 (S.D. Ala. 2002). BMSI agreed to release Cargill from "any and all claims" "arising out of or in any way connected with the use of any [Cargill] equipment." (Doc. # 62-1 at 6). Therefore, Plaintiff's claims (whether arising from a bailment or not) are covered under the release in the contract between BMSI and Cargill.

Additionally, despite Plaintiff's arguments to the contrary, Cargill had no duty to inspect its equipment before BMSI used it. Pursuant to the contract, BMSI agreed to "explicitly warn and notify its employees . . . of any risks, hazards, or peculiar dangers associated with the Work site .

17

. . of which [BMSI] is or should be reasonably aware." (*Id.*). Thus, *BMSI* had a contractual obligation to warn its employees of the dangers associated with working on Cargill's premises – Cargill had no such duty to warn.

### C. Nor Can Plaintiff Recover on a Hidden Defect Theory

In addition to his bailment argument, Plaintiff also attempts to argue that the following "hidden defects" in the tugger caused Plaintiff's injuries: (1) the bolt replacing the entrapment peg; (2) compromised vise chains; and (3) an inoperable force gauge. (Doc. # 70 at 17-20). But, as stated previously, pursuant to Alabama law, "a premises owner's duty to warn extends only to 'hidden defects and dangers that are known [to the premises owner], but that are unknown or hidden to the invitee.'" *S. Ala. Brick Co., Inc.*, 214 So. 3d at 1176 (quoting *Raspilair v. Bruno's Food Stores, Inc.*, 514 So. 2d 1022, 1024 (Ala. 1987)). Specifically, a plaintiff must establish "(1) that the defect or danger was hidden; (2) that it was known to the owner; and (3) that it was neither known to the contractor, *nor such as he ought to know*." *Id.* (internal quotations and citations omitted) (emphasis in original). Plaintiff has not established any of these three requirements. In his response to the motion for summary judgment, Plaintiff merely argues that these "hidden defects" caused his injury, but he does not explain how the defects amounted to a duty to warn by Cargill.

The court concludes that Cargill did not owe Plaintiff a duty to warn. Thus, Plaintiff has failed to establish the first essential element of his negligence claim. Because the court has concluded that Cargill owed no duty to Plaintiff, the court need not address whether Plaintiff established the remaining elements of his negligence claim or whether Cargill established its affirmative defenses. The court next considers Plaintiff's wantonness claim.

### D. Wantonness Claim

Alabama law defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3). "Wantonness is qualitatively different from 'negligence' and involves the conscious doing of some act or omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Armstrong v. Hill*, 290 So. 3d 411, 418 (Ala. 2019) (quoting in part *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (some internal quotations omitted) (emphasis in original)).

Under Alabama law, a wantonness claim arising from the alleged omission of a duty fails as a matter of law when no such duty exists. *Dolgencorp, Inc. v. Taylor*, 28 So. 3d 737, 746 (Ala. 2009). Because Cargill had no duty to warn Plaintiff, it follows that Plaintiff's wantonness claim fails as a matter of law.

### E. Plaintiff's Motions to Exclude and Strike

In addition to filing its Motion for Summary Judgment (Doc. # 61), Cargill filed a Motion to Exclude (# 68) and a Motion to Strike. (Doc. # 72). Both of these motions are moot.

#### i. Motion to Exclude Causation Opinions of Chuck Scarrott (Doc. # 68)

First, Cargill asserts that the causation opinions of Chuck Scarrott (Doc. # 66-2) should be excluded from consideration because (1) they are unreliable and unhelpful and (2) they fail to account for other evidence in the record.

The court has not relied on Chuck Scarrott's causation opinions in considering Cargill's Motion for Summary Judgment. Therefore, Cargill's motion to exclude Scarrott's causation opinions is due to be denied as moot.

        **ii.**      **Motion to Strike Chuck Scarrott's Supplemental Expert Report (Doc. # 72)**

Second, Cargill moves to strike Chuck Scarrott's supplemental expert report. (Doc. # 69-6). Cargill asserts that Scarrott's supplemental export report should be excluded from consideration because it offers several new opinions.

Again, the court has not relied on Scarrott's supplemental report in considering Cargill's Motion for Summary Judgment. Therefore, Cargill's motion to strike Scarrott's supplemental expert report is due to be denied as moot.

## IV.   Conclusion

For the reasons discussed above, Cargill's Motion for Summary Judgment (Doc. # 61) is due to be granted. Cargill's Motion to Exclude Causation Opinions of Chuck Scarrott (Doc. # 68) and Motion to Strike Chuck Scarrott's Supplemental Expert Report. (Doc. # 72) are due to be denied as moot. An order reflecting this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this March 19, 2025.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE